UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF ALFREDO RAMON CERDA,<br><br>A fugitive from the Government of the United Mexican States | Case No. 2:21-cv-09557-CAS-(GJS)<br><br>**MEMORANDUM OPINION, CERTIFICATION OF EXTRADITABILITY, AND ORDER OF COMMITMENT**<br><br>[Dkt. 18.] |

## PROCEDURAL HISTORY

Alfredo Ramon Cerda ("Cerda") was charged by the Government of the United Mexican States ("Mexico") with Comparable Rape, in violation of Article 177 of the Criminal Code of the State of Baja California ("Baja Criminal Code"), and Aggravated Sexual Abuse Against a Child Younger than 14 Years Old, in violation of Articles 180 Bis. and 180 Ter., Section II of the Baja Criminal Code. (Dkt. 1.) On January 6, 2016, Ricardo Melgoza Ortega, Constitutional Rights Court Judge in the Judicial District of Mexicali, Baja California, issued a warrant for Cerda's arrest on the above-listed charges. (*Id.* at 3; Dkt. 18 at 69-78.) Mexico submitted its formal extradition request to the United States pursuant to the

applicable Treaty[1] on November 23, 2020. (Dkt. 18 at 5, 8.) On September 9, 2021, in accordance with its extradition treaty obligations, the United States filed a Complaint for Arrest Warrant and Extradition in this Court. (Dkt. 1.) The United States Marshals Service (the "Marshals") arrested Cerda on November 19, 2021, at Indio, California. (Dkt. 10.)

Cerda was initially detained pending further proceedings. On May 16, 2022, the District Judge set a bond and Cerda was released. (Dkt. 56.) On July 25, 2022, after it was reported that he violated certain conditions of bond, he was remanded to custody. (Dkt. 77.)

On September 22, 2022, the undersigned held an extradition hearing. The Court considered the documents filed by the Government and Cerda as well as the arguments of counsel made at the hearing. The Court's Memorandum Opinion and Certification follows.

**FACTUAL BACKGROUND AND SUMMARY OF EVIDENCE PRESENTED**

The following recitation is a summary of the facts presented and the supporting evidence received from Mexico in support of that country's request for the extradition of Cerda.

According to Mexican authorities, on or about October 18, 2012, M.R.S.A. filed a report with the Public Prosecutor that alleged that Cerda sexually abused L.N.S.A., her nine-year old daughter, and three other children who are siblings - S.L.G.J. (a nine-year-old girl); B.L.G.J. (an eight-year-old girl), and J.E.G.J. (a

---

[1] Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, as amended by the Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, U.S.- Mex., Nov. 13, 1997, S. Treaty Doc. No. 105-46(1998) (collectively referenced herein as the "Treaty").

seven-year-old boy). (Dkt. 18 at 10.) She also reported that Cerda had offered to buy her silence and threatened her. (*Id*. at 13.)

As part of their investigation, Mexican authorities took statements from M.R.S.A., her aunt (M.T.S.L.), her husband (A.H.S.), and the child victims, all of whom documented Cerda's sexual abuse and threats. (*Id*. at 10-16.) In addition, Mexican authorities obtained expert psychological opinions that determined that the child victims had been psychologically affected and required psychological treatment, obtained documentary evidence, conducted identification proceedings, and searched Cerda's residence. (*Id.* at 16.)

**1. Statements of M.R.S.A. (Mother of one of the alleged victims)**

On or about October 15, 2012, M.R.S.A. went to Cerda's home to pick up L.N.S.A., who was being cared for there by M.T.S.L., M.R.S.A.'s aunt. (*Id*. at 101.) When M.R.S.A. arrived at the house, she overheard Cerda say, "[H]urry up because your aunt is going to arrive. . . ." (*Id*. at 101, 105.) She then saw her daughter (L.N.S.A.), S.L.G.J., B.L.G.J., and J.E.G.J. rush out of Cerda's bedroom with Cerda following. (*Id*. at 101.) She also heard the children saying that they were going to wash their hands and brush their teeth. (*Id*.) Suspecting that something had happened, M.R.S.A. confronted Cerda, who denied anything had happened. (*Id*.) When M.T.S.L. joined the discussion and began questioning Cerda, he told the women that he had done nothing to the children and that he had not penetrated them. (*Id*.) While the women and Cerda were arguing, L.N.S.A. entered the house, hugged her mother and began to cry and shake. (*Id*.) L.N.S.A. disclosed to M.R.S.A. that Cerda had forced the children to touch his penis and to have oral sex with him: "we sucked out tata's cock." (*Id*. at 105, 101-02.) The children provided additional details of Cerda's sexual abuse and explained that they kept quiet because Cerda had threatened them and some of their family members. (*Id*. at 102, 105-06.) M.R.S.A. described more of the confrontation with Cerda that occurred after the children were out of the house. (*Id.*) According to M.R.S.A., Cerda kept denying

3

that anything had happened: "[T]hey [the children] do not have anything, they were not penetrated with my fingers or my cock, nothing has happened here." (*Id.* at 105, 102.)

When Cerda said, "nothing has happened to the girls," M.R.S.A. asked Cerda about how the abuse was going to mentally affect the children. (*Id*. at 105.) Cerda replied, "[S]top it, they are okay, anyway I am going to have no problems for this because nothing is going to result; I penetrated neither with my fingers nor my cock. Moreover, you do not accuse me and I will give you a truck and two hundred thousand pesos." (*Id*. at 105-06, 102.) M.R.S.A. responded, "[M]y daughter has no price, if I accept is as if I were selling her and I am not going to heal my daughter with that or anything else." (*Id*. at 106.) Cerda then threatened her: "If you file an accusation, something is going to happen." (*Id.* at 106, 102.) M.R.S.A. told the authorities that when she returned home from Cerda's residence, she spoke with the affected children. (*Id*. at 106.) After assuring the children that nothing was going to happen to them, they told her that Cerda would tell them, "suck my dick and make me a hand job." (*Id*.) They also said that Cerda's abuse started two to three weeks earlier. (*Id.*) The children also denied that M.T.S.L. was aware of what was happening, and that Cerda took steps to ensure that she was out of the house washing clothes when he would abuse them. (*Id.*)

M.R.S.A. said that on or about October 18, 2012, M.T.S.L. and A.H.S. went to Cerda's house to remove M.T.S.L.'s belongings. (*Id*.) However, they were unable to do so, because the night guard said that they had to wait until Cerda returned from Indio, California, and that he was not due back until October 21, 2012. (*Id.* at 102, 106.) On or about the following day, the two returned to the house and found that the fence was closed with padlocks and that Cerda's son's truck was parked inside the yard. (*Id.* at 106.) According to M.R.S.A., on or about October 20, 2012, five of Cerda's children showed up at her house and began arguing with M.T.S.L. (*Id.* at 106-07.) When M.R.S.A. went outside, they accused

her of telling lies against their father. (*Id*. at 107.) They also told A.H.S. that they would give money if the accusations against their father were dropped. (*See id*.) When A.H.S. refused, they threatened him: "[I]f you want a war, a war you will have." (*Id*.) M.R.S.A. told Mexican authorities that she did not want to call the police because she was afraid of Cerda's threats. (*Id*. at 102.) Also, Cerda, who she knew had a lot of money, told her that they (presumably the authorities) were not going to do anything to him. (*Id*.) However, she decided to file charges after she learned that CERDA had gone to the United States. (*Id*.)

### 2. Statement of A.H.S. (Husband of M.R.S.A. and father of one of the victim-children)

A.H.S. told authorities that on or about October 15, 2012, his wife (M.R.S.A.) and daughter (L.N.S.A.) summoned him to Cerda's home. (*Id*. at 131.) After he arrived at the Cerda's home, M.T.S.L. told A.H.S., "That old pig was touching your daughter." (*Id*.) When M.T.S.L. told Cerda that she was going to call the police, Cerda implied that he had a lot of money and would not be detained. (*Id*.) A.H.S. took his daughter out of the house and talked to her about what had happened. (*Id*.) According to A.H.S., L.N.S.A. told him that Cerda had forced the girls to touch his penis with their hands and mouths, and that he had touched them in their private parts. (*Id*. at 131-32.) L.N.S.A. said that Cerda did everything rapidly so he could not be discovered. (*Id*. at 132.) L.N.S.A. said that if Cerda felt that he could be discovered, he took the girls out of his room quickly so they could brush their teeth. (*Id*.) L.N.S.A. said that Cerda had been doing this for approximately three weeks and that he sometimes gave them money, and that she had not disclosed what Cerda was doing because he threatened to hurt them. (*Id*.) A.H.S. told authorities that M.R.S.A. and M.T.S.L. did not want to file charges against Cerda because he had threatened them. (*Id*.) However, on or about October 18, 2012, M.R.S.A. filed charges after learning that Cerda had gone to live in Indio, California. (*Id*.) Two days later, Cerda's adult children came to his home and threatened him and his

5

family. (*Id.*)

### 3. Statement of M.T.S.L. (Aunt of M.R.S.A.)

M.T.S.L. told Mexican authorities that she had known Cerda for approximately 15 years and was in a romantic relationship with him at the time relevant to this action. (*Id*. at 95.) She also regularly performed domestic work around Cerda's home in Mexicali, Baja California, Mexico, including doing laundry and cooking meals. (*Id.*) While she performed these tasks, she often took care of the four children identified herein at Cerda's home. (*Id.*) According to M.T.S.L., on or about October 15, 2012, all four children were under her care at Cerda's home while she attended to her duties there. (*Id.*) That afternoon, she and J.E.G.J. left Cerda's house for a few minutes, while L.N.S.A., S.L.G.J., and B.L.G.J. remained behind. (*Id.*) When M.T.S.L. returned to the house, she encountered her niece (M.R.S.A.), who was angry and told her "[T]hat nasty man is after the girls." (*Id.*) M.T.S.L. then found the three girls washing their hands and mouths. (*Id.*) When she asked what the girls were doing and why M.R.S.A. was upset, the girls, who were crying, told M.T.S.L. that Cerda had made them touch his genitalia. (*Id*. at 95-96.) M.T.S.L. and M.R.S.A. confronted Cerda, who argued with them and denied sexually abusing the girls and remarked that "[t]hey are not penetrated." (*Id.* at 96.) Shortly thereafter, A.H.S. (L.N.S.A.'s father and M.R.S.A.'s husband) arrived and heard B.L.G.J. state that Cerda had threatened the children if they reported to either M.T.S.L. or M.R.S.A. what he had done. (*Id*. at 96.) Also, J.E.G.J. said that Cerda had sexually abused him and gave the children money in exchange. (*Id.*) A.H.S. did not say anything but took L.N.S.A. outside. (*Id.*) On the following day, M.T.S.L. confronted Cerda at his home. He denied doing anything to the children and stated that the children entered his room and did things to him. (*Id.*) M.T.S.L. recalled that she found a small, yellow-colored purse containing money on the bed where the girls used to sleep. (*Id.*) M.T.S.L. later learned that the pursed belonged to S.L.G.J. and that, according to L.N.S.A., Cerda had given her the money when he

forced her to touch his penis. (*Id.*) L.N.S.A. explained that she was saving the money to give to her injured father. (*Id.*) M.T.S.L. also stated that on or about October 18, 2012, one of Cerda's sons blamed her for getting the children close to his father and setting a trap for him. (*Id.*) He added that if her niece (M.R.S.A.) wanted a war, she would get it. (*Id.*) Two days later, five of Cerda's children went to her house and threatened her and her family members. (*Id.* at 97.)

### 4. Statements of Child Victims[2]

#### a. Statement of L.N.S.A.

Nine-year-old L.N.S.A., in the presence of her mother (M.R.S.A.) and a government expert psychologist, told authorities that the first sexual encounter she had with Cerda occurred when, in the living room of his house, Cerda pulled down his pants and his briefs, grabbed her hand, and put it "where he pees." (*Id.* at 109.) She pulled back and ran to her aunt (M.T.S.L.) but did not tell her anything. (*Id.*) L.N.S.A. said that other sexual encounters with Cerda happened repeatedly, beginning approximately three weeks before October 15, 2012. (*Id.* at 109-10.) L.N.S.A. described that, on one occasion, Cerda threatened her with a firearm, saying that something could happen to her family if she did not do what he told her. (*Id.* at 110.) Cerda then asked L.N.S.A. to call the children into the room, and upon their arrival, he pulled down his pants and underwear and forced the children to touch his penis and masturbate him. (*Id.*) Afterwards, he "threw" approximately 40 pesos at the children. (*Id.*) On another occasion, the children went somewhere with M.T.S.L. and Cerda in a pick-up truck. (*Id.*) M.T.S.L. left the children in the truck with Cerda, and when the children were alone with Cerda, he reached over and put his hands between L.N.S.A.'s pants and panties, causing her pain "where she pees."

---

[2] Although redacted from the public filing, Mexican authorities included copies of the minor victims' birth certificates (Exhibit 10) and expert reports of psychology documenting the harm suffered and the treatment required by each minor victim (Exhibits 15-18).

7

(*Id.*)

According to L.N.S.A., on or about October 15, 2012, Cerda called the children to his room and told J.E.G.J. to leave. (*Id.*) When only the girls and Cerda remained in the room, Cerda told the girls to touch and kiss his penis, which they did. (*Id.*) On that day, he also touched the girls in or near their vaginas. (*Id.*)

### b. Statements of S.L.G.J.

Nine-year-old S.L.G.J., in the presence of a government expert psychologist, described to authorities how Cerda would demand the children to touch and lick his penis. (*Id.* at 114-16.) According to S.L.G.J., Cerda had threatened the children that they would be taken to the DIF (a Child Family Services Agency), and that their parents would go to jail, if the children reported Cerda's behavior. (*Id.* at 114.) S.L.G.J. also provided specific examples of incidents during which the children touched Cerda's penis, and when Cerda also touched the children in their private parts. (*Id.* at 114-16.)

### c. Statement of J.E.G.J.

Seven-year-old J.E.G.J., in the presence of a government expert psychologist, corroborated Cerda's behavior, as described by L.N.S.A. and S.L.G.J. (*Id.* at 121-22.) Additionally, according to J.E.G.J., on at least one occasion, Cerda touched J.E.G.J.'s penis and grabbed his hand to forcibly touch Cerda's penis. (*Id.* at 121.) J.E.G.J. told authorities that Cerda sometimes gave the children money after they touched him. (*Id.* at 121-22.) Also, Cerda threatened the children not to say anything about what he was doing. (*Id.* at 122.)

### d. Statement of B.L.G.J.

Eight-year-old B.L.G.J., in the presence of a government expert psychologist, also described to authorities how Cerda would take the children to his room, take off his pants, and ask the children to touch and kiss his penis. (*Id.* at 125-26.) According to B.L.G.J., Cerda would tell the children that, if they did not do as Cerda demanded, they could be taken to the DIF and their father would go to jail. (*Id.* at

125.)

### 5. Search of CERDA's Residence

On October 23, 2012, Mexican authorities searched CERDA's residence. (*Id.* at 16, 135-39.) During the search, they located various firearms, one of which L.N.S.A. identified as the firearm Cerda had used to threatened her. (*Id.* at 136.)

### 6. Identification of CERDA

On or about July 4, 2013, M.T.S.L. identified Cerda from a five-person photographic array. (*Id*. at 176-79.) On or about December 19, 2013, M.R.S.A. identified Cerda from a different five-person photographic array. (*Id*. at 180-84.)

## CERDA'S ARGUMENTS IN OPPOSITION TO THE REQUEST FOR CERTIFICATION ARE WITHOUT MERIT

In Cerda's filed opposition to the Government's request for certification [Dkt. 72] and through his counsel at the September 22, 2022 hearing, Cerda made three arguments. While Counsel's arguments on behalf of Cerda were well-crafted and articulately made, each of them ultimately fails when the Court applies the applicable standards of review.

First, Cerda argues that the extradition Treaty's "lapse of time" provision should be read to require that the provisions of the Speedy Trial Act be applied here, barring certification given the facts and procedural history of this matter. Article 7 of the Treaty states that "[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party." (Dkt. 18 at 25.) Cerda's argument fails, however, because courts have consistently interpreted such lapse of time provisions as referring to statutes of limitation only, not the Speedy Trial Act or other timeliness provisions. *See, e.g., Martinez v. United States*, 828 F.3d 451, 462 (6th Cir. 2016) (en banc) ("Every case on the books has concluded that [lapse of time] encompasses only statutes of limitations."); *Yapp v. Reno*, 26 F.3d 1562, 1568 (11th Cir. 1994) ("[W]e hold that

9

the 'lapse of time' provision in Article 5 of the 1931 Extradition Treaty [between the United States and the Bahamas] refers to the running of a statute of limitations and not to a defendant's Sixth Amendment right to a speedy trial."); *Cf. Kamrin v. United States,* 725 F.2d 1225, 1227-28 (9th Cir. 1984) (rejecting due process claim based on delay and holding that only the applicable statute of limitation could bar extradition under the treaty's lapse of time provision). In this case, Cerda does not claim that his prosecution is barred by any statute of limitation. (*See* Dkt. 72 at 15-21.)

Moreover, as the Government points out, to the extent there was any delay in pursuing extradition, a determination of whether that should impact an extradition determination or not is one left to the Secretary of State. *See, e.g., Man Seok Choe v. Torres*, 525 F.3d 733, 741-42 (9th Cir. 2008), *cert. denied*, 555 U.S. 1139 (2009) ("To the extent there was a delay [in the request for extradition], this is a matter left for the Secretary Of State's consideration"). Thus, the Court finds that Cerda's first argument in opposition to certification is without merit.

Second, Cerda argues that the terms "intercourse" and "copulation" in the Mexican statutes upon which the extradition request are premised are vague or indeterminate and, thus, should not be read to encompass behavior alleged by the witnesses to have occurred, even if the Court finds that sufficient evidence of such behavior exists. The undersigned disagrees. The Mexican court has charged Cerda with violations of the criminal statues set forth above. In other words, the judge who signed the charging document in Mexico did so based on the facts presented and his interpretation of the laws of his country. Consequently, absent a finding that the Mexican court's interpretation was without *any* basis, this Court must defer to Mexico's interpretation of its own laws. *See e.g., Grin v. Shine*, 187 U.S. 181, 190 (1902) ("It can hardly be expected of us that we should become conversant with the criminal laws of [the country seeking extradition]."); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("adhering to our established approach of giving credence

to foreign proceedings" out of "respect for other nations' sovereignty and because we recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles") (internal quotation marks and citation omitted); *see also Skaftouros v. United States*, 667 F.3d 144, 160 n.20 (2d Cir. 2011) (stating that "we defer to the Greek courts, which may consider whether [the fugitive] or the Greek prosecutors have the better of the argument" regarding whether the warrant underlying the extradition request was valid "as a matter of Greek law"). The Court therefore defers to Judge Melgoza Ortega's decision that the elements of the crimes of Comparable Rape and Aggravated Sexual Abuse Against a Child Younger than 14 Years Old under Articles 177 and 180, Bis, Section II, of the Baja Criminal Code, are satisfied at the level appropriate to issue a complaint and warrant.

Finally, Cerda contends that internal inconsistencies in the witnesses' statements render the evidentiary value of those statements so low as to require the Court to find that the probable cause standard has not been met. It is not within this Court's purview to evaluate witness credibility, though, so Cerda's arguments in this regard must fail. Based on the evidence detailed above, which the Court understands is a subset of that presented to the judge in Mexico, the Court holds that it is more likely than not that Cerda has committed the charged crimes.

## CERTIFICATION

Having held an extradition hearing on September 22, 2022, and after considering the evidence, in particular, the certified and authenticated documents submitted by the Government of the United Mexican States ("Mexico"), and the pleadings and the arguments of both counsel, the Court finds and certifies to the Secretary of State as follows:

1. This Court has jurisdiction over, and the undersigned is authorized to conduct, extradition proceedings pursuant to 18 U.S.C. § 3184 and General Order 05-07 of the United States District Court for the Central District of California.

2. This Court has personal jurisdiction over ALFREDO RAMÓN CERDA, also known as ("aka") "Alfred Raymond Cerda," aka "Alfredo Ramon Cerda Martinez," aka "El Tata," ("Cerda"), found and arrested on November 19, 2021, in this District pursuant to a complaint filed by the United States in response to the request of the Government of Mexico for the arrest and extradition of Cerda;

3. Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, *as amended by* the Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S. Treaty Doc. No. 105-46 (1998), was in full force and effect at all times relevant to this action;

4. The person appearing before this Court is the same "Alfredo Ramón Cerda" wanted by the Government of Mexico in its extradition request;

5. Cerda has been charged in Mexico, and the United States is proceeding in this extradition matter, on the following charges: Comparable Rape, in violation of Article 177 of the Criminal Code of the State of Baja California ("Baja Criminal Code"), and Aggravated Sexual Abuse Against a Child Younger than 14 Years Old, in violation of Articles 180 Bis. and 180 Ter., Section II of the Baja Criminal Code. The Government of Mexico has jurisdiction over the above offenses;

6. The above referenced Treaty between the United States and Mexico, pursuant to Article 2, encompasses the offenses for which Cerda has been charged and for which extradition is sought for trial;

7. The Government of Mexico submitted documents that were properly authenticated and certified in accordance with Title 18 U.S.C. § 3190. Those documents include the pertinent text for the crimes with which Cerda has been charged;

8. There is probable cause to believe that the individual identified as Cerda appearing before this Court is the same person identified in the extradition

request from the Government of Mexico, and is the person who committed the offenses for which extradition is sought; and

9. The evidence before this Court is sufficient to justify Cerda's committal for trial, had the offenses with which he is accused of having committed occurred in the United States. This finding rests upon the documents submitted by the Government of Mexico in this matter, and the findings of fact and conclusions of law enumerated above.

THEREFORE, pursuant to 18 U.S.C. § 3184, the above findings, and the factual and legal conclusions set forth herein, THE COURT HEREBY CERTIFIES the extradition of ALFREDO RAMÓN CERDA to Mexico, on the above offenses for which extradition was requested.

IT IS ORDERED that ALFREDO RAMÓN CERDA remain committed to the custody of the U.S. Marshal pending final decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. § 3186.

IT IS FURTHER ORDERED that the Clerk of the Court forthwith deliver to the Assistant U.S. Attorney a certified copy of this Memorandum Opinion and Certification and Committal for Extradition and forward without delay certified copies of the same to the Secretary of State (to the attention of the Office of the Legal Adviser) for appropriate disposition.

**IT IS SO FOUND AND ORDERED.**

DATED: October 4, 2022

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

13